In the Matter of Herbert G. HEIMS and Mary J. Heims, Debtors.

FIRST STATE BANK OF MANCHESTER, Plaintiff,

v.

Herbert G. HEIMS and Mary J. Heims; James Cusic and Marion Cusic; John McAndrews; and Daniel P. Ernst, Trustee, Defendants.

Adv. No. 85–0350D.

United States Bankruptcy Court, N.D. Iowa.

Sept. 2, 1986.

---

T. McCuskey, Klinger, Robinson & McCuskey, Cedar Rapids, Iowa, for First State Bank of Manchester.

Victor V. Sprengelmeyer, East Dubuque, Ill., for debtors.

Daniel P. Ernst, Dubuque, Iowa, Trustee.

Mary Browne McCuskey, Clemens & King, Dubuque, Iowa, for John McAndrews.

James and Mary Cusic, Corydon, Iowa, for defendants.

ROBERT D. MARTIN, Bankruptcy Judge.

On January 13, 1983, the First State Bank of Manchester, Iowa ("the bank") opened a $240,000.00 credit line for the debtors who in turn granted the bank a security interest in, *inter alia,* all existing and after acquired crops, "supplies used or produced in farming operations," contract rights and accounts, and the proceeds from the contract rights and accounts. The bank filed a financing statement with the Iowa Secretary of State on January 14, 1983. The bank made numerous loans to the debtors in 1984. At the time of the bankruptcy filing, the bank was owed $232,701.08 by the debtors and was secured by collateral (excluding the check at issue in this case) worth approximately $167,-115.00.

Part of the collateral securing the loan was an assignment by the debtors of their purchasers' interest in a land contract covering property where they lived in Dubuque County, Iowa ("the land contract"). The land contract, dated May 1, 1977, was assigned on May 1, 1978, to the Cusics (defendants) who in turn assigned it to the debtors on April 2, 1982. Both assignments were properly recorded.

On March 8, 1985, Herbert and Mary Heims filed for bankruptcy under chapter 11. While their case was pending, they

received a check for $7,455.77 dated April 9, 1985 ("the check"), in payment on a contract with the Commodity Credit Corporation ("CCC"), approved by a CCC representative on April 18, 1984, under which the debtors agreed to limit the number of acres of corn they grew and devote a certain percentage of the land to approved conservation uses.

On July 12, 1985, the bankruptcy court granted the bank's motion to lift the automatic stay so that it could take action to collect the proceeds of the 1984 deficiency payment. The court also granted the Cusics' motion to require the debtors to assume or reject the land contract within fifteen days. On August 2, 1985, the debtors rejected the land contract and on August 5 they voluntarily converted their case to a chapter 7. On August 23, 1985, the chapter 7 trustee, Daniel Ernst, abandoned the property.

The dispute in this case arises because the debtors cashed the check and allegedly used the proceeds to plant their 1985 corn crop.[1] The Cusics and John McAndrews (the vendor on the land contract) claim an interest in the debtors' 1985 crop by virtue of their titles to the land. The bank also claims an interest in the crop because of its security interest in contract rights, including the debtors' 1984 contract with CCC, and its proceeds. The debtors claim the 1985 crop is theirs as the product of their labor. On October 28, 1985, the court ordered the 1985 corn crop to be sealed until the competing interests in it could be resolved. The corn has since been sold and the proceeds held pursuant to a stipulation and court order.

Three issues must be resolved. 1. Do the Cusics or John McAndrews have a right to the 1985 crop under the land contract? 2. Does the bank have a right to the 1985 crop as proceeds of its security interest in contract rights? 3. Do the debtors have a claim against the proceeds of the 1985 crop for their labor input?

**I.**

■ The Cusics and John McAndrews claim an interest in the 1985 crop as vendee's assignees and vendor of the land on which it was grown. In support of their position, the Cusics cite Iowa Code Annot. ("I.C.A.") § 654.12 (West 1950). It and its companion statute, I.C.A. § 654.11, provide:

> 654.11  Foreclosure of title bond
>
> In cases where the vendor of real estate has given a bond or other writing to convey the same on payment of the purchase money, and such money or any part thereof remains unpaid after the day fixed for payment, whether time is or is not of the essence of the contract, the vendor may file his petition asking the court to require the purchaser to perform his contract, or to foreclose and sell his interest in the property.
>
> 654.12  Vendee deemed mortgagor
>
> The vendee shall in such cases, for the purpose of the foreclosure, be treated as a mortgagor of the property purchased, and his rights may be foreclosed in a similar manner.[2]

These statutes, which had their origins in the 1851 Iowa Code, provide land vendors with an alternative remedy to forfeiture, a remedy which has been strictly construed by the courts because of its draconian nature. *See generally*, Comment, *Installment Land Contracts-Vendor's Remedies-Combining Acceleration and Forfeiture*, 51 Iowa L.Rev. 488 (1966); Note, *Forfeiture and the Iowa Installment Land Contract*, 46 Iowa L.Rev. 786 (1961). When the buyer is treated as a mortgagor of the property, a default on the contract results in a judicial sale of the property subject to

---

1. All parties except the Cusics have stipulated that the debtors used the proceeds from the deficiency check to plant the 1985 crop.

2. [A] bankruptcy court must look to state law to determine a mortgagee's interest. If that interest is perfected under state law, the bankruptcy court must insure that the mortgagee is afforded the same protection in bankruptcy that it would have been under state law if no bankruptcy had ensued.
   *In re Gotta*, 47 B.R. 198, 210 (Bankr.W.D.Wis. 1985), *citing Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

a one-year statutory right of redemption. I.C.A. §§ 628.3, 654.5 (West 1950). The paucity of land contract foreclosure cases reflects the fact that this cumbersome and expensive procedure is rarely used when forfeiture is available. *Forfeiture* 46 Iowa L.Rev. at 795–6.

The Cusics claim that since they are in effect mortgage holders, they have a superior lien on the crops. The assignment agreement between the debtors and the Cusics does not contain any provision entitling the Cusics to rents and profits in the event of default. The land contract was not submitted to this court, nor was it alleged that it contained a rents and profits provision. However, for the purposes of discussion, it will be assumed that it had one.

■ Since the Iowa Uniform Commercial Code ("UCC") does not apply to rents and profits clauses in mortgages, the court must look to other state property law to determine a mortgagee's interest in rents and profits. I.C.A. § 554.9104(j); *In re Winzenburg*, 61 B.R. 141, 142 (Bankr.N.D. Iowa 1986). Under Iowa law, a mortgage rents and profits clause creates a lien not on default but when a foreclosure action is commenced and the appointment of a receiver requested. *John Hancock Mut. Life Ins. Co. of Boston, Mass. v. Linnan*, 205 Iowa 176, 218 N.W. 46, 49 (1928). *See also Junkin v. McClain*, 221 Iowa 1084, 265 N.W. 362, 367 (1936). Since a land contract vendor is governed by same rules of law as a mortgagee, there was no lien on rents pledged until the foreclosure action was commenced and appointment of receiver requested. This principle was recently reaffirmed by this court. *Winzenberg* 61 B.R. at 143 *citing Andrew v. Haag*, 215 Iowa 282, 245 N.W. 436, 439 (1932).[3] Until the foreclosure action is filed, the mortga-

gor is free to dispose of crops grown upon the mortgaged premises. *John Hancock* 218 N.W. at 48. Furthermore the mortgagee's lien on appointment of a receiver is subject to any prior lien on the crops. *See First Trust Joint Stock Land Bank of Chicago, Ill. v. Conway*, 215 Iowa 1031, 247 N.W. 253, 254 (1933). Neither Cusics nor McAndrews made any allegation of having filed the requisite foreclosure action and, thus, they have no rights in the 1985 crop under I.C.A. § 654.12.

■ The Cusics also claim the crops as the land owners after the abandonment of the property by the trustee. They do not cite any law for this assertion. Land contract vendors, unlike mortgagees in lien states such as Iowa, retain title to the property until the purchase price is paid. G. Osborne, *Mortgages*, § 127 at 207, § 20 at 29 (1970). The Cusics were assigned the vendee's right to possession and the right to have title conveyed to them upon payment of the debt. They in turn assigned this right to the debtors. It was this right, and not title to the property, which reverted to the Cusics on the termination of the assignment contract. Furthermore, even if they had been the legal owners, they still would not be entitled to the crops since they were aware that the debtors remained in possession after abandonment. This made the debtors tenants-at-will under Iowa law, I.C.A. § 562.4, and entitled them to the crops growing on the land at that time. *Martin v. Knapp*, 57 Iowa 336, 10 N.W. 721 (1881).

## II.

It is not disputed that the bank perfected its security interest in existing and after-acquired contract rights in January 1983 pursuant to I.C.A. §§ 554.9204, 554.9401, 554.9402. Whether this was sufficient to

---

**3.** In 1921, the 39th General Assembly provided for a method of lien perfection which allowed liens created by rents and profits clauses in mortgages to be effective from the date of mortgage's execution rather than from the filing of the foreclosure petition if the mortgage was indexed with the chattel mortgages. 1921 Iowa Acts ch. 246 § 1 (later Iowa Code § 556.21

(1962)). *See Equitable Life Ins. Co. of Iowa v. Brown*, 220 Iowa 585, 262 N.W. 124, 127–8 (1935). This method of lien perfection was eliminated when the Iowa legislature adopted the UCC and repealed I.C.A. § 556.21. *See* 35B I.C.A. Appendix: Laws Repealed by the Uniform Commercial Code (West 1967). *See also Winzenberg*, 61 B.R. at 143.

perfect an interest in the deficiency payment from the 1984 crop and whether the bank remained perfected when the debtor later used the proceeds of the check to put in the 1985 crop, are the issues before this court.

Although federal law governs questions involving rights arising under federal programs, state commercial law determines creditor's rights in payments received under federal farm subsidy programs such as this. *In re Kruse,* 35 B.R. 958, 963 (Bankr. D.Kan.1983) citing *U.S. v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *In re Sunberg,* 35 B.R. 777 (Bankr.S.D.Iowa 1983) *aff'd* 729 F.2d 561 (8th Cir.1984) which is the controlling Iowa case on the issue is substantially similar to the present case. The Sunbergs granted their PCA a security interest in, *inter alia,* "contract rights, accounts and general intangibles existing or hereafter acquired." Thereafter, Mr. Sunberg signed several PIK (payment-in-kind) contracts agreeing to receive payment in government surplus corn. The court found that the omnibus clause of the security agreement was intended to cover any future property interests that might arise from the debtors' participation in one of these programs and held that the contract right to a payment-in-kind was a general intangible as the term is used in I.C.A. § 554.9106. Because the PIK payment would be the proceed of the contract when it was paid to the debtors, the court found that PCA's security in the payment continued in bankruptcy under 11 U.S.C. § 552(b).

The primary difference between this case and *Sunberg* is that payment was made in the form of a check rather than corn. There is nothing in that decision which would suggest this difference should yield a contrary result. Like the creditor in *Sunberg,* the bank properly perfected a secured interest in accounts and contract rights. It was not necessary for the security agreement to list "general intangibles" since "contract rights" is a specific type of intangible. *Sunberg,* 35 B.R. at 782 *quoting* the Official Comment to I.C.A. § 554.-9106. The bank's interest in subsidy payments was also covered by its security interest in accounts. *See Sunberg,* 727 F.2d at 562. The bank remained continuously perfected under I.C.A. § 554.9306(3)(a) when the proceeds of the deficiency payment were used to acquire farm supplies to grow the 1985 crop because the bank already held a perfected interest in these assets from its 1981 filing.[4]

### III.

The trustee is not allowed to use the cash collateral in the ordinary course of business without notice or hearing unless each entity that has an interest in the collateral consents. 11 U.S.C. § 363(c)(2)(A). The bank did not give such consent. On April 5, 1985, four days prior to the date of the check, a bank officer called the debtors' attorney and told him that the debtors would soon be receiving the subsidy check. They agreed that the check might be covered by the bank's security agreement and the debtors' attorney promised he would advise his clients not to use the money without the permission of the bankruptcy court or the bank. When the debtors made unauthorized use of the deficiency payment proceeds they violated section 363 and the bank's security interest in the proceeds continued notwithstanding the disposition of the collateral. I.C.A. § 554.9306(2).

The trustee may recover the reasonable and necessary costs and expenses of preserving or disposing of secured property for the benefit of the secured creditor. 11 U.S.C. § 506(c). This may give the debt-

---

4. Section 554.9306(4) is not applicable in this case since at the time the bankruptcy petition was filed, the bank's collateral was still in the form of a contract right which had not yet resulted in proceeds. *See In re Hugo,* 58 B.R. 903, 907–8 (Bankr.E.D.Mich.1986) (UCC 9–306(3), not 9–306(4), determines the extent to which a creditor retains a security interest in proceeds acquired post-petition). *See also In re SMS, Inc.,* 15 B.R. 496 (Bankr.D.Kan.1981); *In re Air Florida System Inc.,* 49 B.R. 321 (Bankr.S. D.Fla.1985); *In re Turner,* 13 B.R. 15, 22 (Bankr. D.Neb.1981) at fn. 1.

ors a derivative claim for the cost of their labor input. "However, the full amount of the costs and expenses is recoverable only if the lienholder has impliedly or expressly consented or caused [them] to be incurred." *In re Manchester Hides, Inc.*, 32 B.R. 629, 633 (Bankr.N.D. Iowa 1983). "Thus, expenses which are incurred during periods when the collateral could have been abandoned and turned over to the secured creditor are not 'necessary expenses' within the meaning of section 506(c)." *In re Combined Crofts Corp.*, 54 B.R. 294, 297 (Bankr.W.D.Wis.1985). *See also In re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982). Since the proceeds from the deficiency payment should have been turned over to the bank in April 1985 as requested, the debtors are not entitled to any wages as a necessary expense to the detriment of the secured party.

This memorandum decision constitutes my findings of fact and conclusions of law in this proceeding. An order consistent with the conclusions may issue.

The court having this day entered its memorandum decision in the above-styled matter,

IT IS HEREBY ORDERED that the First State Bank of Manchester is entitled to $7,455.77 of the proceeds of the debtors' 1985 corn crop plus interest calculated from April 9, 1985.